Filed 5/13/24  P. v. Starks CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUSTIN EUGENE STARKS,<br><br>    Defendant and Appellant. | C097919<br><br>(Super. Ct. No. 22FE000510) |

A jury convicted defendant Justin Eugene Starks of human trafficking, pimping, and pandering of a minor.  It also found true that the victim was particularly vulnerable, the crimes demonstrated planning, sophistication, and professionalism, and Starks took advantage of a position of trust or confidence.  On appeal, Starks argues the aggravating circumstances jury instruction failed to fully define the terms "particularly vulnerable victim" and "planning, sophistication, and professionalism."  Starks further contends all the instructions improperly failed to inform the jury the People had to prove beyond a

1

reasonable doubt that his conduct was distinctively worse than the ordinary commission of the underlying crime. Starks also asserts the "particularly vulnerable" instruction was improper because it failed to tell the jury it could not rely on the victim's age to support the aggravating factor because being a minor was an element of the underlying offense. We will affirm.

## BACKGROUND

The information alleged Starks committed human trafficking of a minor, pimping a minor, and pandering a minor. (Pen. Code, §§ 236.1, subd. (c)(1), 266h, subd. (b)(2), & 266i, subd. (b)(2).)[1] The information further alleged the following aggravating factors: (a) the victim was particularly vulnerable; (b) the manner in which the crimes were carried out indicated planning, sophistication, or professionalism; and (c) Starks took advantage of a position of trust or confidence. (Cal. Rules of Court, rule 4.421(a)(3), (8) & (11).)[2]

The 15-year-old victim in this case was four foot 11 inches tall and weighed about 115 pounds. She lived with her grandmother until about seventh grade and after that, she alternated between living with her grandmother and her mother. The grandmother testified the victim was in and out of juvenile hall and there was an attempt to place the victim in her custody, but the grandmother did not finish the paperwork because the victim's mother did not want the grandmother to have her. As a result, the victim came and went to and from her grandmother's home all the time. The crimes in this case occurred between August and September of 2021. At that time, the victim was living with her mother.

The grandmother told the jury the victim was forced into prostitution at the age of 14. The grandmother knew of two men who had prostituted the victim: one was in

---

[1] Undesignated statutory references are to the Penal Code.

[2] Undesignated rule references are to the California Rules of Court.

prison, and the other was Starks. As to Starks, the grandmother told him the victim was 15 and he should leave her alone. Starks just smiled in response.

In August 2021, the victim asked her grandmother to take her to a motel to pick up some clothes because the person she left them with was threatening to throw them out. When they arrived at the motel, the victim told her grandmother to stay in the car and went to the door of a room, pounded on it, and screamed that she wanted her stuff.

Eventually Starks opened the motel door and the two went downstairs to his car to get her stuff.[3] The victim's grandmother told the motel's manager to call the police and tell them that Starks had prostituted the victim. The grandmother testified that about a month after this incident, Starks picked the victim up again.

The bulk of the prosecution's case was presented through the testimony of Detective McClusky. In September 2021, Detective McClusky found several online prostitution advertisements out of Stockton featuring the victim. The advertisements read, "Always available for a meet-up, Daddy," and informed the reader the victim was available for all types of different sexual acts. Detective McClusky contacted the Stockton Police Department's human trafficking investigators to see if they could recover the victim. The investigators made contacted with the victim but were unable to set up a meeting.

Detective McClusky obtained the victim's cell phone after she was arrested on an outstanding warrant. The victim saved Starks's phone number in her phone as "Mac Jay." In the human trafficking culture, "Mac" means the top trafficker or top pimp.

---

[3] Detective Henry McClusky of the Sacramento Police Department learned about the encounter between the victim and Starks from the victim's grandmother. He went to the motel and obtained a printout of Starks's reservation, his license plate information, and a copy of his driver's license. Starks was born in 1987. The license plate information matched the car Starks was driving at the time he was arrested.

The text messages between Starks and the victim started on August 21, 2021, and ended on September 7, 2021. Altogether, there are 295 pages of messages.

During trial Detective McClusky read portions of the text messages as follows:[4] "First message, (Reading) I got one, Daddy. The response is, good shit, love. And then she messages, going back now. [¶] . . . [¶] He responds, (Reading) Okay. She messages, I'm back. They respond, okay, how much you get? She responds, one hundred literally for nun. They respond, LOL. She messages, Daddy, this N-word trying to give me 60 just to sit with him for few minutes. Should I or no? Daddy, should I? They respond, yeah, get it." Detective McClusky testified this exchange was about acts of prostitution in an area called the "blade,"[5] getting money for those acts, giving that money to the trafficker, and the trafficker saying whether it was worth engaging in the act of prostitution. Detective McClusky also testified that "sex workers"[6] often call their trafficker "Daddy."

Detective McClusky read the next set of messages as follows: "Is it lit, Daddy WYA -- which is where you at -- around the corner. Oh, okay. She then says, when the parking lot starts to clear out, can you take me to the other side? I'm back, though. Yeah, just let me know. Okay, Daddy. WYD -- what you doing. She responds, trying to get one, they all just playin' though or broke. And then, Daddy, take me to the other side. Another one. Okay, I'm here. Get that. Okay. Well, wait for me to be done, though, 'cause I want you take me to the other side, please. I am." Detective McClusky

---

[4] The reporter's transcript of this portion of the trial entailed Detective McClusky reading the text messages to the jury, however, that exhibit is not in the clerk's transcript. We will quote the message exchanges as they were read in the reporter's transcript.

[5] The "blade" is an area in a town known for prostitution.

[6] The witness referred to "sex workers" throughout his testimony but we note that a person under the age of 18 cannot consent to a commercial sex act. (18 U.S.C. § 1591(a); 22 U.S.C. § 7102(11)(A).)

4

interpreted this exchange to mean the victim wanted Starks to drive her from one side of the blade to the other. He also testified these exchanges allow the trafficker to keep tabs on the sex workers they control and let the trafficker know how much money they should expect from their sex worker.

Another exchange of the text messages were read as follows: "(Reading) I'm almost back. Okay. How much you get? TF -- is the fuck -- you mean I just told you it was dry, ain't no looking or nun. It's too MF -- motherfucking -- early to be out here. This is just hella hot. The only thing I see passing is cops. Okay. You say like I ain't trying to catch nun. If it was just trying to catch nun, TF would I be here -- would I be here for. Bro, what are we doing because Ima get irritated because I'm just looking stupid being out here right now, RN. Let's go T. To where? West Sac. Okay. Whatever. Until then, get some money, BMM. Yeah. If there was any effing tricks out here. I hate what you be saying shit like that. Like, N-word, I'm trying. I know, Mommy. Mhm, M-H-M. When we 'posed to be going to Old Sac. Tonight." Detective McClusky testified "tricks" is a term used for sex buyers.

Detective McClusky also read the following series of text messages to the jury: "(Reading). . . . I got one, but it's a car full of um, it's three . . . but they all want to do some with me for 100 each. Daddy, just text me so I know you see my texts just in case some happens. Because I'm worried because it's three of them. I know I probably shouldn't be because it's money, but I just am. Yeah. Okay. They said it's ten minutes away. Is that good or should I go back? Just want to make sure with you, Daddy, so I don't get in trouble by you. Is three N-words, question mark. Yes. Nah, don't. Daddy, they seem cool, though, and I don't want to miss out on the money, and they said if I'm not comfortable with that, they could get a telly[7] by the blade." Detective McClusky

---

[7] A "telly" is a hotel.

interpreted this exchange to mean the victim had been approached by a car with three black men who wanted her to perform acts of prostitution at the same time.

The exchange continued: "(Reading). . . . Okay. Go. So it's closer. But are you sure? I don't want you to be mad. Yeah. Okay, Daddy. Go. We at the store right now. They get the money out the ATM, then we gonna go to the telly and then I'm going to do it and go back to the blade, but if everything goes right, I'm making an easy 300, but I'm gonna keep these tricks to these the type of N-words to cash you out. From New York visiting down here. They keep trying buy me hella shit and talking about they will fly me out to New York and shit and pay for everything. These N-word is stupid. They out here for a few more days and all three of them want to meet with me again tomorrow and if I ain't did nothing yet. I am at the telly now. Okay."

Later in the text messages, the victim texted Starks, "What's the bitch name you told me to knock?" According to Detective McClusky, this meant Starks wanted the victim to recruit another sex worker to work for him.

In another series of text messages, the victim told Starks she would not perform oral sex for a sex buyer because that act was reserved for "Daddy." She continued, "Okay. TF -- the fuck -- do I look like putting my mouth on an N-word's dick and then going home with you trying to kiss you. It will be out of pocket." Detective McClusky testified "out of pocket" meant being out of line and not following the rules of human trafficking, and that it was common for a sex worker to have a relationship with their trafficker. The victim reported she had $370 on her and texted Starks to "come get the trap." Trap is the money made from acts of prostitution.

The messages also indicated the victim needed more condoms. Detective McClusky testified that traffickers require their sex workers to use condoms so they can track the number of acts of prostitution each night and the money they should expect.

The messages continued -- the victim reported her activities, the money she made, requested rides from Starks, and reported on the nature of the conditions and police

6

activities around her. At one point, the victim reported one of her sex buyers started to get aggressive and tried to choke her. Starks responded, "Stop letting these N-words take you where you don't know where you at. How'm I supposed to help you? Tell me." Starks also told the victim, "I'm saying I always got to come get you. You never have a ride back. And yes, I'm coming because we need to get this money."

In another series of text messages, the victim told Starks: "I ain't going to do you wrong, Daddy. . . . My brother said he can start taking me to Stockton every night because he works out there and I can bust dates out there, and he said he'll post an ad for me to get. Don't even want me to pay him, though. He just wants me to start trimming tree for again. But I made hella money out there last night in just like two hours off an ad. . . . I just wanted to tell you because we could always do that, too, so more money coming in -- comes in."

Detective McClusky obtained search warrants for the victim's and Starks's social media accounts. Each of these accounts was following the other account, which means each person can see the other person's posts and message each other.

Detective McClusky testified about text messages between the two accounts regarding more acts of prostitution: "It says, (Reading) LOL. She responds, dead ass serious, though. The message is, where you at. She responds, just got back to the blade. He responds, okay. I'm pulling up in a few. She responds, okay. You want to just hand you trap or what? Want me. He responds, yeah, Ima get it in a minute. Okay, well, I just got another one for 100. He responds, okay. Bust that move. She responds, okay, Daddy. [¶] . . . He says, where you at? She responds, I'm about to have my mom drop me off at the store by 15th and then I'm walk to the telly. He responds, okay. She says, because I just beat the fuck out of my ex. They set me up and shit. I'm walking from a street right now. I'll tell you the rest when I get there. He responds, okay."

Detective McClusky also shared messages where Starks told the victim not to hit him and she agreed. When the victim asked Starks to let her know if he found her aunt's

7

ashes, Starks responded, "fuck that." When she told him that was disrespectful, Starks told her he needs his money. Detective McClusky testified this conversation appeared to mark the end of their relationship and that the victim was moving on to a new trafficker. During this exchange, the victim texted Starks that she had just turned 18 years old and had an identification card to prove it.

The People played Detective McClusky's interview of Starks for the jury. During the interview, Starks claimed he met the victim downtown and she was just a friend. Starks did not know why the victim called him "Daddy." Starks asserted the victim told him she was 18 (or 17 going on 18), but he did not know how old she was. Starks claimed he did not know what the victim did and denied having sex with her. Specifically, Starks said he did not know the victim was engaged in prostitution and he did not know anything about "pimpin.' " He denied he knew what the "blade" was, but admitted he provided her with condoms when she asked. He claimed he had a lot of condoms because he and his girlfriend practice safe sex. Starks claimed he asked the victim for gas money a couple of times "and things like that." Starks said that when the victim texted him, she "got one Daddy" and he responded, "Good Shit, Love," he believed she had obtained marijuana. When she asked him, "I'm with these two tricks but they talking about three other people $80 each. Should I or no," Starks claimed he thought she was talking about selling marijuana. He told her to go ahead because they needed the money. When she asked him about a "trap," Starks said he thought she was talking about marijuana again.

Sergeant John Sydow of the Sacramento Sheriff's Department testified as an expert on sexual exploitation and human trafficking. He was not familiar with the facts of this case. He testified risk factors that make the youngest victims more susceptible to human trafficking are coming from a dysfunctional family, having parents with unstable lives, drug addiction and mental health problems, and being a victim of sexual assault. He also testified it was common for victims of human trafficking not to cooperate with

8

law enforcement and the victims commonly claim prostitution is their choice. Juveniles who are trafficked often continue in prostitution after getting away from a particular trafficker. For many, the victimization is all that they know and with the impression that this is the only thing they are good for, it is not uncommon for juveniles to turn back to being prostituted as it is the only way they know how to get money.

An adult pimp provides basic needs for a juvenile sex worker. It is difficult for a juvenile to pay their own rent, buy food, or a car. As a result, these juveniles tend to be reliant upon these adults who prey on them to help them. The pimp provides the victim with a family connection and the basic human emotions the juvenile may not have experienced in their life. Pimps groom their victims by normalizing sex acts with others for money. This normalization helps keep victims in prostitution. Pimps also use control over the victim's property to control the victim.

At the conclusion of the evidence, the trial court instructed the jury on the aggravating factors as follows: "If you find the defendant guilty of the crimes charged in Counts 1, 2 and 3, you must then decide whether the People have proved the additional aggravating factor that in commission of that crime the victim was particularly vulnerable in violation of [California Rules of Court,] Rule 4.421(a)(3). . . . [¶] . . . [¶] If you find the defendant guilty of the crimes charged in Counts 1, 2 and 3, you must then decide whether the People have proved the additional aggravating factor that in the commission of that crime that the manner in which the crimes were carried out indicated planning, sophistication or professionalism in violation of [California Rules of Court,] Rule 4.421(a)(8). . . . [¶] . . . [¶] If you find the defendant guilty of the crimes charged in Counts 1, 2 and 3, you must then decide whether the People have proved the additional aggravating factor that in the commission of that crime that the defendant took advantage of a position of trust or confidence to commit the offense in violation of [California Rules of Court,] Rule 4.421(a)(11)." Each instruction informed the jury the People had the burden of proof as to each aggravating factor beyond a reasonable doubt, and if the

9

People did not meet that burden, the jury was required to find the allegation had not been proven. Starks's counsel did not object to these instructions, seek any clarification of these terms, nor did counsel raise this issue in his closing argument.

In closing argument, the prosecutor stated: "[The victim] was vulnerable for a variety of reasons. She's 15 years old. She comes from this unstable home. She has this previous trauma of being trafficked before. And Sergeant Sydow did a great job of how all that makes her susceptible to being trafficked again. She has this void in her life and she is looking for some man to fill that void. That's what she sees when she looks at the defendant, a way to feel something that she doesn't feel from her home or her community, the places that a less vulnerable victim would typically find support. Even aside from her age at 15, that alone makes her vulnerable. But even aside from that, we can think of her in comparison to a stable, well-adjusted 15-year-old, someone who has great parents who is talking to them about what they are involved in, someone who has a community that they know they can reach out to for support when they need it, somebody who doesn't have this exposure of what Sergeant Sydow called normalizing this lifestyle. That's what happens for these young girls. That young girl would be in a much less vulnerable position than [the victim] would. [The victim] is the absolute definition of a vulnerable victim here."

After its deliberations, the jury found Starks guilty of all three charges and found the relevant three aggravating factors true. At sentencing, the trial court found Starks treated this young victim, who had mental health problems, in a deplorable and dehumanizing manner and as a commodity.

The trial court placed greater weight on the factors in aggravation the jury found than it did on the fact Starks had a troubled and difficult childhood and stated its belief Starks was a danger to the community. The trial court stated: "But given the circumstances that the victim was particularly vulnerable, extremely true, the crime did indicate planning, sophistication and professionalism. There were ads placed for this

10

young victim. The defendant did take advantage of a position of trust. He was told by the grandmother stay away from her, she's underage. Nevertheless, he continued to engage. And I do find that his prior convictions are numerous, although I would agree with [Starks's counsel], many of them are misdemeanors, but what is disturbing to the Court is two of them involve domestic violence, so we're talking about crimes against people that he is in intimate relationships with, that he is willing to use force with, and so I think that is also in part true."

The trial court found the aggravating factors more compelling than any in mitigation and sentenced Starks to the upper term of 12 years in prison for trafficking a minor. It also imposed eight-year terms for each of the other two charges, but stayed them pursuant to section 654. Starks filed a timely notice of appeal in February 2023. His opening brief was filed in September 2023, and this case became fully briefed on March 7, 2024.

## DISCUSSION

Starks argues the instructions fail to adequately define the terms "particularly vulnerable victim" and "planning, sophistication, and professionalism." Starks further argues each of the jury instructions the trial court gave on the aggravating factors was erroneous because they did not tell the jury the People had to prove beyond a reasonable doubt that Starks's conduct made the crime distinctively worse than the ordinary commission of the crime. Finally, Starks argues the instructions did not advise the jury that it could not rely on the victim's age to support the particularly vulnerable victim factor because her age was an element of the crime. We find no merit in these contentions.

A.    *Legal Principles*

From March 30, 2007, to December 31, 2021, California's determinate sentencing law specified that "[w]hen a judgment of imprisonment [wa]s to be imposed and the statute specifie[d] three possible terms, the choice of the appropriate term . . . rest[ed]

11

within the sound discretion of the court." (§ 1170, former subd. (b).) Effective January 1, 2022, Senate Bill No. 567 (2021-2022 Reg. Sess.) amended section 1170, subdivision (b). (Stats. 2021, ch. 731, § 1.3.) Section 1170, subdivision (b)(2) now provides, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We review the wording of the jury instruction and assess whether it accurately states the law. (*Ibid.*) We must consider whether a reasonable likelihood exists that the challenged instruction "caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Ibid.*)

B.    *Definitions*

Starks argues the trial court should have defined the term "particularly vulnerable victim" for the jury drawing on the language from the newly released CALCRIM No. 3226[8] (which did not exist at the time of trial) and case law construing that phrase. The People contend Starks forfeited this contention by failing to object. Starks also argues the trial court failed to define what planning, sophistication, and professionalism means,

---

[8] CALCRIM No. 3226 uses the following language to define this term: "*Particularly vulnerable* includes being defenseless, unguarded, unprotected, or otherwise susceptible to the defendant's criminal act to a special or unusual degree. [¶] In determining whether _____ <*insert name of victim*> was *particularly vulnerable*, you should consider all of the circumstances surrounding the commission of the crime, including the characteristics of _____ <*insert name of victim*> and the manner and setting in which the crime was committed."

12

but the argument portion of the brief was limited to the contention the instruction failed to inform the jury that the People had the burden of proof to prove that Starks's conduct was distinctly worse than the ordinary crime. We reject Starks's claims.

To the extent Starks cites the newly available form jury instructions, jury instructions are neither the law nor are they "authority to establish legal propositions or precedent." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.) The fact that jury instructions have been amended with additional clarifying language to better assist jurors does not make previous versions of the instruction incorrect. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 902.)

Starks notes that for " 'purposes of finding the aggravating factor of particular vulnerability [], " '[p]articularly . . . means in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act,' " ' " citing to *People v. DeHoyos* (2013) 57 Cal.4th 79, 154.

It is true that instructional error may be reviewed even when no objection is interposed where it affects the substantial rights of the defendant. (§ 1259.) But "[w]hen a word or phrase ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574.) "It is only when a word or phrase has a 'technical, legal meaning' that differs from its 'nonlegal meaning' that the trial court has a duty to clarify it for the jury." (*People v. Jennings* (2010) 50 Cal.4th 616, 670.) Moreover, "[w]hen an instruction as given is correct in law, it is incumbent on defendant to request clarifying language, and his failure to do so forfeits the issue." (*People v. Kaihea* (2021) 70 Cal.App.5th 257, 265.)

Here, the instruction the trial court gave is correct on the law because it exactly parrots the words of the Rules of Court for this aggravating circumstance. We have no

13

quarrel with Starks's recitation of the judicial gloss on "particularly vulnerable victim," but this gloss does not change the fact that the phrase, as used in this instruction, does not have a special legal meaning that departs from common usage. This jury was instructed with CALCRIM No. 200 that "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary everyday meanings." We presume they followed these instructions.

In his brief, Starks's argument about the definition of planning and sophistication and occupying a position of trust or confidence was limited to the argument that the trial court failed to tell the jury the People had the burden to prove that Starks's conduct was distinctively worse than the ordinary commission of the underlying crimes. We will address this argument, *post.*

Having failed to object to the particularly vulnerable instruction or request clarifying language, Starks has forfeited this contention.

C. *Distinctively Worse*

Starks contends *People v. Moreno* (1982) 128 Cal.App.3d 103 required the trial court to instruct the jury the People must have proved beyond a reasonable doubt that Starks's conduct made the crime distinctively worse than the ordinary crime to find each of the aggravating factors true. We disagree.

Starks also points to the new CALCRIM Nos. 3226, 3230, and 3233, which each instruct the jury: "You may not find the allegation true unless all of you agree that the People have proved that the defendant's conduct was distinctively worse than an ordinary commission of the underlying crime." As we have already stated, these instructions are neither new law nor precedent. (*People v. Morales, supra*, 25 Cal.4th 34, 48, fn. 7.)

Turning to *Moreno,* there the defendant appealed his conviction of assault with a deadly weapon. (*People v. Moreno, supra*, 128 Cal.App.3d at p. 106.) The defendant argued the trial court erred in using the fact that he had a deadly weapon in sentencing him as a circumstance in aggravation term because the use of the deadly weapon was an

14

element of his crime. (*Id.* at p. 109.) The appellate court concluded "the essence of 'aggravation' relates the effect of a particular fact in making the offense distinctively worse than the ordinary. The case before us involves an assault by means of a knife. We are not referred to any statement of legislative policy indicating that knives are distinctively worse than other types of weapons." (*Id.* at p. 110.) Thus, the court concluded this fact could not be used to impose an upper term. (*Ibid.*)

While *Moreno* provides depth for the meaning of a circumstance in aggravation, we conclude that case does not stand for the proposition that the trial court must instruct the jury that the People have the burden of proving the aggravating circumstance made the crime distinctively worse than the ordinary crime. Indeed, this 1982 case was not a jury instruction case at all as the concept of circumstances in aggravation were not required to be presented to the jury until the Legislature amended section 1170 effective January 2022. (Stats. 2021, ch. 731.)

Further, the fact that an aggravating circumstance means the crime is distinctively worse is not an element of finding the underlying fact to be true. *Chavez Zepeda v. Superior Court* (2023) 97 Cal.App.5th 65 (*Chavez Zepeda*) is instructive on this point. There, the appellate court examined whether the terms contained in the Rules of Court for aggravating factors were too amorphous for a jury to interpret. (*Id.* at p. 81.) The appellate court noted these aggravating factors were not constitutionally objectionable simply because they used a qualitative standard like "particularly vulnerable." (*Id.* at p. 88.) In specifically examining the concept that aggravating factors make crimes distinctively worse, the *Chavez Zepeda* court noted that courts applying this standard, "have not imagined an abstract, 'ordinary case' to determine whether a finding of an aggravating circumstances is warranted by the facts of the case." (*Id.* at p. 89.) Instead, "they have considered whether the manner of the crime's commission was distinctively worse 'when compared to other ways in which such a crime could be committed.' " (*Ibid.*) The appellate court noted, "[w]hen appellate courts have reversed an upper-term

15

sentence on the ground that the cited aggravating circumstance did not make the commission of the crime distinctively worse, they have generally concluded that the circumstance at issue was likely to be present in most any instance of the offense or added little to the wrongfulness already inherent in its commission." (*Id.* at p. 90.)

The *Chavez Zepeda* court also noted that the trial court retains the discretion not to impose a greater sentence based upon the jury's finding these aggravating factors might exist. (*Chavez Zepeda, supra*, 97 Cal.App.5th at pp. 86, 91.) This discretion is a meaningful protection against the risk of an erroneous deprivation of a defendant's liberty interest. (*Ibid.*)[9]

As applied here, the jury was required to determine whether three facts pled and submitted to the jury existed; whether the victim was particularly vulnerable, whether the crimes demonstrated planning, sophistication, and professionalism, and whether Starks abused a position of trust. It was not charged with determining whether these facts made the crime distinctively worse than the ordinary crime; that was a legal determination to be made by the judge at sentencing in deciding whether or not to impose the upper term. (§ 1170, subd. (b)(2) ["The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those

---

[9] The *Chavez Zepeda* court anticipated that "jurors can be (and we expect that they will be) given additional guidance and explanation, both in the meaning of qualitative terms, which have been defined in the case law over the years, and in the meaning of the requirement that the aggravating circumstance makes the commission of the offense distinctively worse." (*Chavez Zepeda*, *supra,* 97 Cal.App.5th at p. 91.) But the court did not hold that the recently released CALCRIM instructions must be given and was quick to point out it was not "not called upon to decide whether the phrase 'distinctively worse than an ordinary commission of the underlying crime' in the instructions accurately articulates that requirement as applied in the case law or is consistent with constitutional vagueness standards." (*Id.* at p. 91, fn. 6.)

circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial"].)

In this case, the three facts found to exist by the jury are not present in every crime of human trafficking, pimping, or pandering of minors. Not all victims are particularly vulnerable. Planning, sophistication, and professionalism are not necessarily the hallmark of these crimes. Not every pimp, human trafficker, or panderer uses trust and confidence to harness and control their victims. It is the existence of these facts in this case that make the way this offense was committed worse than the base crimes and hence gives rise to the essence of an aggravating circumstance here. The trial court was not required to instruct the jury on this concept.

D. *Victim's Age*

Starks asserts the jury should have been instructed it could not consider the victim's age in deciding whether she was particularly vulnerable because the fact that the victim was a minor was an element of the offense. We conclude any error here was harmless.

"Generally, where the victim's age is an element of the offense, the court may not cite the victim's vulnerability due to being that age as a reason to impose the aggravated term." (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 195, fn. omitted.) In *Alvarado,* the trial court used the victim's age plus the fact that she lived alone to impose the aggravated term even though being over 65 was an element of the charged offense. (*Ibid.*) Under these circumstances, the appellate court concluded, "the trial court could reasonably, and properly, rely on the *combination* of these facts to find that the victim was particularly vulnerable." (*Ibid.*) Put differently, a minor "may be determined to be particularly vulnerable because of other factors that exist. Some of the potential factors which have been recognized are mental deficiency, physical handicaps, intoxication, supervision or control of a defendant over a victim, and extreme youth within the given age range." (*People v. Garcia* (1985) 166 Cal.App.3d 1056, 1069-1070.)

17

Assuming it was error not to inform the jury it could not solely rely on the victim's age, the victim's age here plus the other concurrent facts lead us to conclude the jury would have reached the same conclusion in finding the victim vulnerable.[10] The victim was a runaway from a broken home having been bounced from her mother's home to her grandmother's home with little stability and apparent involvement of the juvenile justice system. She was extremely petite. She experienced the trauma of being forced into prostitution at the age of 14. Finally, Starks had a position of supervision and control over the victim as evidenced by the multitude of messages advising her whether to take on sex buyers. Starks provided her with protection, transportation, and lodging. All of these facts demonstrate it is not reasonably probable the jury would have reached a different conclusion about whether the victim was particularly vulnerable if it was instructed that it could not rely solely on her age regarding this aggravating factor.

## DISPOSITION

The judgment is affirmed.

_____/s/_____
BOULWARE EURIE, J.

We concur:

_____/s/_____
EARL, P. J.

_____/s/_____
KRAUSE, J.

_____

[10] The parties are not in agreement regarding the proper standard for harmlessness. Starks argues we should apply the standard articulated in *Chapman v. California* (1967) 386 U.S. 18 [beyond a reasonable doubt, the error did not contribute to the verdict]; the People argue we should apply the lesser standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. We need not resolve this dispute because, even applying the higher *Chapman* standard, we conclude there was no prejudice.